UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 6:16-CR-21-ART-HAI-2 |
| v. | ) | |
| | ) | REPORT & RECOMMENDATION |
| MAURICE SYDNOR, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Maurice Sydnor has moved to suppress two statements he made to law enforcement officers during the execution of a state search warrant at his residence. D.E. 65. He also challenges three photo identifications made by witnesses. *Id*.; D.E. 114 at 18. The Court conducted an evidentiary hearing on October 3, 2016, during which Kentucky State Police Detective Jason Browning, ATF Special Agent Todd Tremaine, and Kentucky State Police Detective Larry Walker testified. D.E. 78, 80. Sydnor filed a post-hearing memorandum (D.E. 114), the government responded (D.E. 119), and Sydnor replied (D.E. 121).

Sydnor argues that he was impermissibly arrested without probable cause, and his incriminating statements should therefore be suppressed as the fruit of the poisonous tree. D.E. 114 at 11-12, 16. In the alternative, Sydnor argues that the two statements were made during custodial interrogation, in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). *Id*. at 12-16. Sydnor also seeks to suppress certain witness identifications, arguing that they were unduly suggestive because they were based solely on his driver's license photo. *Id*. at 17-21.

1

The Court finds that Sydnor was not placed under formal arrest when officers handcuffed him at the beginning of the search.  However, Sydnor was in custody for purposes of *Miranda* during the search.  Regarding the statements themselves, the first one was an unsolicited voluntary utterance outside the scope of *Miranda*.  In contrast, the second statement was elicited by a direct question whose answer could only reasonably be incriminating.  The Court will recommend that Sydnor's motion to suppress be granted only in regard to the second statement. Concerning the witness identifications, the Court will recommend that the motion to suppress be denied.  The government has met its burden of showing that the identifications were reliable.

## I.  Background

The facts surrounding the execution of the search warrant and Sydnor's confession are contained in the Affidavit of Complaint (D.E. 1-1, 7/11/2016, Affidavit of Raleigh Benge as to Maurice Sydnor), the Kentucky State Police report (D.E. 65-1), the ATF case reports (D.E. 65-2, -3), the transcript of the evidentiary hearing (D.E. 103), Sydnor's memorandum in support of his motion (D.E. 114), and the government's response (D.E. 119).  The witness identifications will be discussed in a later section.

Law Enforcement was using a confidential informant ("CI") to investigate suspected drug dealer Timothy Harris.  D.E. 103 at 11.  At one point, law enforcement sent the CI to meet Harris at the residence of Harris's associate "Black," who was later determined to be Sydnor.  *Id*. at 12-13.  After the CI drove to the residence in a car monitored by law enforcement, Harris and Sydnor arrived in another vehicle.  Harris got into the passenger seat of the CI's vehicle.  Sydnor went inside the residence and returned with a brown bag that he passed to Harris.  Harris told the CI to drive to another location.  *Id*. at 13-14; D.E. 65-1 at 2-3.  On the way, Harris forced the CI to stop the vehicle and get out.  Harris left in the CI's car.  Using the tracking device that was

2

installed in the CI's car, law enforcement caught up with Harris and pulled him over. D.E. 65-1 at 2-3; D.E. 65-3 at 1-2, 8-9. They found almost three pounds of crystal methamphetamine in the brown bag. D.E. 1-1 at 4; D.E. 65-3 at 7; D.E. 103 at 14.

An officer involved in Harris's traffic stop then contacted Detective Walker for assistance in obtaining a search warrant for the residence where the CI met Harris and "Black." D.E. 103 at 14. Using information from the CI, Det. Walker (who had not previously been involved in the case), obtained and executed a search warrant for the residence, which turned out to be Sydnor's. *Id.* at 14-15. The warrant authorized a search for, among other things, controlled substances and firearms. D.E. 119-1.

The warrant was executed around 2:45 a.m. D.E. 103 at 18, 60. According to reports, officers forced their way inside after Sydnor failed to respond to knocks and loud verbal commands. D.E. 65-1 at 4; *see also* D.E. 103 at 27-28. There was a "strong odor of freshly burnt marijuana" inside the residence. D.E. 65-1 at 4. The report by the Kentucky State Police contains the following account, with the statements Sydnor seeks to suppress rendered in bold type:

> A male individual emerged from the second floor of the residence who was later identified as Maurice SYDNOR, AKA "Black." SYDNOR had no shirt or shoes on and stated that he stays at the residence and stated that his girlfriend and child weren't present.
> Investigators proceeded throughout the residence checking for additional occupants which yielded negative results. SYDNOR wasn't under arrest, but was placed in handcuffs for officer safety and SYDNOR was told he wasn't under arrest. Det. Walker informed SYDNOR the basis of the search warrant and he wasn't under arrest and **SYDNOR voluntary stated that he didn't know what was inside the bag that he handed to HARRIS earlier in the day.** SYDNOR stated that HARRIS is his cousin.
> Det. Walker was sitting with SYDNOR on the couch in the living room and SYDNOR heard one investigator tell another investigator that a camera was needed upstairs in the bedroom. Investigator's note: Two rifles were discovered inside a closet located in master bedroom. The rifles were inside a rifle case.

3

They were photographed for future reference and seized. See item # 1,2,3.

        SYDNOR asked if he can put on his shoes before he goes to jail. Det. Walker stated, "why would you be going to jail." At this point **SYDNOR stated that he was a convicted felon and the rifles are his for protection of his family.** Det. Walker and Det. Browning inquired with SYDNOR if he wanted to assist with the ongoing investigation relating to HARRIS and Somerset, Ky., and he declined, and shortly afterwards was formerly charged with possession of firearm by convicted felon and transported to Jefferson County Jail.

D.E. 65-1 at 4-5.

At the evidentiary hearing, KSP Detective Jason Browning testified that he attended the search of Sydnor's residence. D.E. 103 at 9. When he went inside, he saw Sydnor on the floor being handcuffed. *Id*. at 10. Det. Browning testified that there was no arrest warrant for Sydnor, and that he knew of no probable cause to arrest him at the time the warrant was executed. *Id*. at 10, 20, 21.

Det. Browning testified that there were six other officers involved in the search. *Id*. at 17. Det. Browning saw Sydnor and Det. Walker sitting on a couch in Sydnor's living room during the search. *Id*. at 16. Det. Browning said he heard Sydnor say he did not know what was in the bag he passed to Harris. *Id*. at 18-19. At the time, Det. Walker was explaining to Sydnor the search warrant, which was on the table in front of Sydnor. *Id*. Det. Browning did not hear Det. Walker ask any question about the bag. *Id*. at 19-20. When the rifles were discovered in Sydnor's bedroom, Det. Browning went upstairs and saw them. *Id*. When he returned downstairs, he asked Sydnor if he was willing to cooperate. Sydnor was not. *Id*. Det. Browning did not hear Sydnor's statement about putting on his shoes before going to jail. *Id*. at 34-35.

Det. Walker also testified concerning the search. He said that when the officers entered the residence and Sydnor came downstairs, he ordered Sydnor to the floor. Sydnor complied, and was handcuffed behind his back. Then, the handcuffs were moved to Sydnor's front and

Sydnor sat on the sofa.  D.E. 103 at 48-50.  Det. Walker explained that handcuffing the occupant is "normal protocol" during the execution of a search warrant.  It is done, he said, for safety, because there may be hidden dangerous instruments.  *Id*. at 65.

Once Sydnor was on the sofa, Det. Walker explained the basis of the search warrant. D.E. 103 at 50-52.  Although Det. Walker did not administer *Miranda* warnings, he did tell Sydnor that he was not under arrest.  *Id*. at 50, 67.  Det. Walker testified that Sydnor was free to leave during their discussion, although Sydnor was not told he was free to leave.  *Id*. at 50. While explaining the probable-cause basis of the search warrant, Det. Walker told Sydnor about how they believed he had brought the bag of methamphetamine to Harris in the CI's car.  Sydnor then volunteered that he did not know what was in the bag.  *Id*. at 51-52.  Det. Walker testified that the discussion did not involve any psychological ploys to elicit a confession.  *Id*. at 52.  He was merely explaining why the officers were there.  *Id*.  Det. Walker testified he always explains the probable cause basis to targets of a search warrant.  He testified that he largely does this "to put them at ease."  *Id*. at 52, 54.  Det. Walker never drew his gun.  *Id*. at 55.  During the search, his job was "just sitting with Mr. Sydnor as a babysitter" while the other officers searched.  *Id*. at 56.

Eventually, while Det. Walker and Sydnor sat in the living room, an officer upstairs called for a camera.  *Id*. at 57.  Sydnor then asked if he could put on his shoes before he went to jail.  Det. Walker asked, "Why would you be going to jail?"  Det. Walker testified, "Then that's when he stated that the rifles are his, and he's a convicted felon."  *Id*.  Det. Walker asked Sydnor if he wanted to cooperate in the investigation, and Sydnor replied that he did not.  *Id*. at 59. According to Det. Walker, the search lasted from 2:45 a.m. to 4:00 a.m.  *Id*. at 60-61.  Det. Walker was not aware of anyone giving *Miranda* warnings to Sydnor that day.  *Id*. at 50, 67.

## II.  No Illegal Arrest

Sydnor argues that when he was handcuffed at the beginning of the search, law enforcement made an illegal arrest without probable cause.  D.E. 114 at 10-11.  According to Sydnor, his statements were therefore the "fruit of the poisonous tree" and subject to suppression.  *Id* at 11-13.  He argues:

> Sydnor was placed under arrest as soon as law enforcement entered his home. Sydnor was "instructed to come downstairs" immediately when officers first made contact with him.  [Det.] Walker then commanded Sydnor to "[g]et down on the floor."  At that point, Sydnor "was being restrained" while officers handcuffed him.  Sydnor remained handcuffed from that point forward.
>
> As a result, no "reasonable person" in Mr. Sydnor's position would believe that he retained any "freedom of action," much less the ability to terminate the encounter and depart.  Furthermore, Sydnor was never told that he was free to go, nor was he ever provided with *Miranda* warnings at any point.  It follows that Sydnor's immediate, prolonged, and indefinite restraint with handcuffs constituted a "formal arrest," and he was "in custody" the entire time officers were executing the search warrant.
>
> Moreover, Mr. Sydnor's arrest at this time was unlawful.  As Detectives Browning and Walker testified, law enforcement did not possess an arrest warrant for Sydnor when they entered his home.  Instead, both Browning and Walker said that they had sufficient evidence to arrest Sydnor only after other officers discovered firearms in the bedroom and Sydnor admitted his ownership.  It follows that Sydnor's immediate arrest upon law enforcement entry into his home was improper.

D.E. 114 at 10-11 (citations omitted).  The facts, as Sydnor describes them, are not in dispute. However, Sydnor's legal conclusions derived from these facts are flawed.  Sydnor was not the victim of an illegal arrest; his seizure was a permissible temporary detention associated with the execution of a search warrant.

"When officers execute a search warrant at a suspect's home, they enjoy an implicit, limited authority to detain the occupants at the premises—even with handcuffs—without making an arrest."  *United States v. Wagner*, 289 F. App'x 57, 59 (6th Cir. 2008) (citing *Muehler v. Mena*, 544 U.S. 93, 98-99 (2005)).  As the Supreme Court explained in *Mena*, such detentions

are justified by "substantial" interests, including: "preventing flight in the event that incriminating evidence is found; minimizing the risk of harm to the officers; and facilitating the orderly completion of the search, as detainees' self-interest may induce them to open locked doors or locked containers to avoid the use of force." *Mena*, 544 U.S. at 98 (quoting *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981)) (quotation marks omitted). Further,

> Inherent in *Summers*' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention. . . . Indeed, *Summers* itself stressed that the risk of harm to officers and occupants is minimized 'if the officers routinely exercise unquestioned command of the situation.'"

*Id*. at 98-99 (quoting *Summers*, 452 U.S. at 703). The Court also recognized that searches for weapons and drugs are "inherently dangerous situations" in which suspects sometimes erupt in "sudden violence or frantic efforts to conceal or destroy evidence." *Id*. at 100 (citing *Summers*, 452 U.S. at 702-03). The *Mena* Court found that handcuffing a suspect during a search "was undoubtedly a separate intrusion" beyond the initial seizure and detention of the suspect. *Id*. at 99. But handcuffs are justified in such "inherently dangerous" searches. *Id*. at 100. And detentions under *Summers* are not arrests. *Summers*, 452 U.S. at 702; *United States v. Binford*, 818 F.3d 261, 270 (6th Cir. 2016) ("Because Binford was permissibly detained [in handcuffs] during the execution of the search warrant, the detention did not amount to an unlawful arrest without probable cause."); *Wagner*, 289 F. App'x at 59; *see also United States v. Fountain*, 2 F.3d 656, 666 (6th Cir. 1993) ("[T]he use of handcuffs does not necessarily turn an encounter into an arrest for which probable cause is required.").

Sydnor's detention did not amount to a formal arrest because it fits within the *Summers* exception under *Mena*. Here, the search warrant authorized law enforcement to search Sydnor's residence for, among other things, "[c]ontrolled substance[s]" and "[f]irearms and ammunition."

7

D.E. 119-1 at 5.   Officers had reason to believe that "Black" had retrieved a bag from the residence containing almost three pounds of crystal meth, distribution of which would constitute a Class A felony, and given it to Harris.   Additionally, officers smelled freshly burned marijuana when they entered Sydnor's residence, further signaling the presence of drugs and the possibility that Sydnor could be intoxicated.   Finally, officers actually found weapons in the residence.   The detention of Sydnor in handcuffs, accompanied by a reasonable show of force, was a permissible detention short of arrest under *Summers*.

Nor did Sydnor's detention ripen into being unreasonable or the equivalent of an illegal arrest.   *See* D.E. 121 at 1-2 (alleging that Sydnor's detention was impermissible because it was "prolonged and indefinite").   The Supreme Court has recognized that the duration of a *Summers* detention can "affect the balance of interests" in favor of finding that a detention was unconstitutionally "unreasonable."   *Mena*, 544 U.S. at 100 (finding that a two- to three-hour detention in handcuffs was not unreasonable under the circumstances); *see also Summers*, 452 U.S. at 705 n.21 (noting that "special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case").   But Sydnor has not pointed to any case in which a *Summers* duration of comparable length was held to be illegal.   Nor has he identified a factual basis for finding the detention unnecessarily exceeded the search of the residence. Weighed in the light of other cases, Sydnor's detention was not prolonged and indefinite, but was properly measured by the search.

Both parties make arguments from the recent *Binford* case.   *See* D.E. 119 at 9-10; D.E. 121 at 5 (citing *United States v. Binford*, 818 F.3d 261 (6th Cir. 2016) (declining to suppress statements made while a search warrant was being executed)).   On one hand, *Binford* is distinguishable because the defendant waived his *Miranda* rights at the beginning of his

*Summers* detention.  *Binford*, 818 F.3d at 265.  The interesting wrinkle in *Binford* is that an officer took the defendant aside into a bathroom and questioned him.  The Court found that the initial detention was authorized under *Summers* and the that the officer was permitted to take him aside in a bathroom for questioning on the basis of reasonable suspicion.  The Court held:  "[the officer] had the authority under *Summers* to detain Binford incident to the search warrant.  Further, because the two controlled purchases of marijuana gave [the officer] reasonable suspicion of criminal activity, he also had authority to subject Binford to a brief investigatory detention [and question him in a bathroom]."  *Id*. at 268.  Sydnor argues that reasonable suspicion under *Binford* did not exist in his case because law enforcement could not tie him to any drug transaction.  But this is irrelevant.  Sydnor's situation was a classic detention in furtherance of a properly issued search warrant under *Summers* and *Mena*.  Sydnor was never taken aside for questioning like Binford.  It therefore matters not whether law enforcement could tie Sydnor factually to any drug transactions.

Because Sydnor was not illegally arrested, his incriminating statements cannot be suppressed as fruit of the poisonous tree.

### III.  *Miranda* Issues

Alternatively, Sydnor argues that his incriminating statements were obtained in violation of his Fifth Amendment right against self-incrimination under *Miranda v. Arizona*, 384 U.S. 436 (1966).  D.E. 65 at 2; D.E. 114 at 12-16; D.E. 121 at 8-13.  When a suspect is "in custody," *Miranda* requires officers to inform the suspect of certain rights before he can be interrogated. *See Stansbury v. California*, 511 U.S. 318, 322 (1994).  Absent *Miranda* warnings, incriminating statements elicited through custodial interrogation must be suppressed.  *Oregon v. Elstad,* 470 U.S. 298, 317 (1985).  Here, the parties agree no *Miranda* warning preceded Sydnor's

incriminating statements. So suppression hinges on whether Sydnor was subject to both (1) custody and (2) interrogation.

### A. Custody

In asserting a *Miranda* claim, the defendant bears the initial burden of establishing—by a preponderance of the evidence—that he was in custody. *See Colorado v. Connelly*, 479 U.S. 157, 169 (1986); *United States v. Lawrence*, 892 F.2d 80 (6th Cir. 1989) (table); *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984); *United States v. Solomon*, No. 6:13-CR-40-ART-HAI-5, 2015 WL 5474395, at *9 (E.D. Ky. Sept. 17, 2015); *United States v. Adams*, No. 6:09-CR-16-DCR, 2009 WL 2913926, at *5 (E.D. Ky. Sept. 9, 2009). Although the government argues otherwise, Sydnor has met this burden.

The question of whether Sydnor was in custody is separate from the previous question of whether he was arrested when officers first entered his residence. A detention or seizure that is not an arrest may still be custodial for *Miranda* purposes if there was a "restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury*, 511 U.S. at 322. Answering the custody question requires courts to consider "all of the circumstances" and focus on the "objective circumstances" of the alleged interrogation. *Id*. The question is "how a reasonable person in that position would perceive his or her freedom to leave." *Id*. at 325. The Sixth Circuit considers several guiding factors: "the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (citing *United States v. Swanson,* 341 F.3d 524, 529 (6th Cir. 2003)). Here, the first two factors weigh against custody, but the second two suggest that Sydnor was in custody. In this case, the extent of Sydnor's restraint is the most

significant factor.

Here, the length of the questioning is not indicative of custody.  In *Panak*, the Sixth Circuit noted that interviews lasting from 45 minutes to an hour and a half have been found to be non-custodial.  *Panak*, 552 F.3d at 467; *see also United States v. Mahan*, 190 F.3d 416, 422 (finding an interview that "lasted only an hour and a half" non-custodial).   Here, officers occupied Sydnor's home for an hour and fifteen minutes before he was arrested on state gun charges.

What about the "manner" of questioning?  The officers were not overbearing or hostile in this case.  According to the officers, Sydnor was asked no questions at all until he requested to put on his shoes before he went to jail.  At that point, Det. Walker asked why he would be going to jail.  Later, both Det. Walker and Det. Browning asked Sydnor if he was willing to cooperate. So, one aspect of the "manner" of questioning was that officers asked no questions until Sydnor asked one himself.  However, another aspect of the "manner" of the questioning was that Sydnor was never given anything close to a *Miranda* warning during the entire hour-and-fifteen-minute search, despite the fact that he was clearly a target of the investigation.  In total, however, the manner of questioning does not tilt the scales in favor of custody.

The location of the questioning is also not suggestive of police custody.  The Court of Appeals in *Panak* noted that one's home is his "castle," and that police encounters in a person's residence will often "not rise to the kind of custodial situation that necessitates *Miranda* warnings."  *Panak*, 552 F.3d at 465-66 (quoting *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1988)).  But there are exceptions.

> Even when an interrogation takes place in the familiar surroundings of a home, it still may become custodial without the officer having to place handcuffs on the individual.   The number of officers, the show of authority, the conspicuous

display of drawn weapons, the nature of the questioning all may transform one's castle into an interrogation cell—turning an inherently comfortable and familiar environment into one that a reasonable person would perceive as unduly hostile, coercive and freedom-restraining.

*Id.* at 466 (citations omitted).  For reasons that will soon be explained, this encounter crossed the line, despite occurring in Sydnor's own home.

Another factor is whether the suspect was told he "need not answer the questions."  *Id.* at 465.  Here, Sydnor was never *asked* any questions until he made his own comment about the shoes.  But, after that point, he was questioned.  No evidence suggests he was informed that he did not have to answer questions.  This factor is suggestive of custody.

The remaining factor is "whether the individual possessed unrestrained freedom of movement during the interview."  *Id.* at 465.  The ultimate custody question "is not whether the individual felt pressure to *speak* to the officers but whether she was forced to *stay* with them."  *Id.* at 471.  Given the total facts of this case, a reasonable person in Sydnor's circumstances would not have felt free to leave.  Here, six officers forcibly entered his home at 2:45 a.m.  When he came downstairs, Sydnor was ordered to the ground and handcuffed behind his back.  After officers conducted an initial safety sweep, Sydnor's handcuffs were moved to the front and he was "placed on the couch."  D.E. 103 at 54.  Sydnor remained handcuffed throughout the entire relevant time period.  Det. Walker told Sydnor he was not under arrest, but never told him he was free to go.  *Id.* at 50.

Once he was on the couch, Det. Walker told Sydnor "that he was observed taking a bag out to a car that—that was later discovered to have crystal meth in that bag."  *Id.* at 51.  Although Det. Walker testified that he routinely explained the probable cause underlying a search warrant to "calm [the suspect's] nerves," he acknowledged that in doing so, he had "implicated [Sydnor]

12

in a crime." *Id.* at 51-52.

This set of facts is more similar to those appearing in cases where custody was found than the opposite. Several details are indicative of custody. The first is the use of handcuffs. Although the use of handcuffs is not dispositive in favor of finding custody, it is an important factor. For example, the Court in *Panak* noted that a home interview "may become custodial without the officer having to place handcuffs on the individual," a statement which suggests that the use of handcuffs favors a finding of custody. *Panak*, 552 F.3d at 466; *see also United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (finding no custody when "[t]he officers did not place Defendant in handcuffs or otherwise restrain his freedom"); *United States v. Brooks*, 379 F. App'x 465, 473 (6th Cir. 2010) (finding no custody when "no show of force was made, such as the use of handcuffs or the brandishing of a firearm"); *United States v. Flores*, 193 F. App'x 597, 606 (6th Cir. 2006) (finding no custody when Defendant "was not handcuffed, confined, or restrained" as he sat on his living room sofa); *United States v. White*, 270 F.3d 356, 366 (6th Cir. 2001) (finding that an in-home interview was not custodial when Defendant "had complete freedom of movement" and "was not handcuffed or physically restrained"). The Sixth Circuit has categorized handcuffs as "equipment ordinarily associated with formal arrest or custody" and an "item[] associated with force or coercion." *Mahan*, 190 F.3d at 422-23; *see also Brooks*, 379 F. App'x at 473 (describing the use of handcuffs as a "show of force"); *United States v. Mullins*, No. 7:11-CR-04-ART-EBA, 2011 WL 1327030, at *3 (E.D. Ky. Mar. 21, 2011) (noting repeatedly the use of handcuffs during a custodial interview), *report and recommendation adopted*, 2011 WL 1303321 (E.D. Ky. Apr. 6, 2011). In *Panak*, the Court noted that "the officers did not handcuff Panak or physically restrain her," a factor that weighed against custody. *Panak*, 552 F.3d at 467. Further, the investigators in *Panak* "did not possess, much less

13

brandish, firearms or handcuffs." *Id*.  In Sydnor's case, in contrast, the officers were armed (D.E. 103 at 16, 55), and Sydnor was handcuffed immediately and remained handcuffed throughout the search of his home.  Not only was he handcuffed, he was initially handcuffed on the floor with his hands behind his back.  D.E. 103 at 48-50.  The fact that Sydnor was constantly physically restrained weighs in favor of finding that he was in custody.

Another relevant detail is the fact that Sydnor was never told he was free to leave.  D.E. 103 at 50.  In close cases, "the existence of such advice might affect the outcome." *Panak*, 522 F.3d at 468.  Informing a suspect that he may end an interview at will is not a necessary condition to finding no custody, but it is a "frequently sufficient condition." *Id*. at 467 (noting that Panak was never told that she was a suspect).  Sydnor was told he was not under arrest, but was not advised that he was free to leave.  Although the weight of this factor is reduced by the fact Sydnor was told he was not under arrest, the factor does weigh in favor of custody.  *United States v. Levenderis*, 806 F.3d 390, 401 (6th Cir. 2015).  On a related note, although the time of day is not an explicit factor in this analysis, Det. Walker acknowledged that Sydnor might not have had anywhere else to go at 3:00 in the morning.  As the transcript memorializes:

> Det. Walker:   Basically he was told to come downstairs, and he complied, and he was ordered down to the—to the floor.
>
> Q.    And he complied with what you asked him to do, when you said, "Get down on the floor?"
>
> A.    Yes.
>
> Q.    Words to that effect.  And then you handcuffed him?
>
> A.    That's correct.
>
> Q.    Did you Mirandize him after you handcuffed him?
>
> A.    No, I did not.  I also told him he wasn't under arrest; we were here for a

14

search warrant.

Q.      Was he free to go after you cuffed him?

A.      If he wanted to, yes, which it was his residence and 3:00 in the morning, so I'm not certain where I would tell him he was free to go to.

Q.      So . . . you didn't tell him he was free to go, did you?

A.      No.

D.E. 103 at 49-50.  This detail leans in favor of custody.

A third important detail is that Detective Walker had implicated Sydnor in a serious crime.  The Court in *Panak* explained:

> An investigator's knowledge of an individual's guilt "may bear upon the custody issue" not simply because the officer possesses incriminating evidence but because he has "conveyed [it], by word or deed, to the individual being questioned," . . . and thus has used the information to create a hostile, coercive, freedom-inhibiting atmosphere.  That is why such knowledge is relevant only if (1) it was "somehow manifested to the individual under interrogation" and (2) it "would have affected how a reasonable person in that position would perceive his or her freedom to leave."

*Panak*, 552 F.3d at 469 (quoting *Stansbury v. California*, 511 U.S. 318, 325 (1994)).  Here, Det. Walker conveyed his belief that Sydnor had passed a bag of crystal meth to Harris.  D.E. 103 at 51, 56.  Det. Walker "manifested" and "conveyed" his knowledge of Sydnor's guilt.  That knowledge would reasonably affect one's perception of freedom to leave.  Under the standards of *Stansbury*, Det. Walker's insinuation of serious criminal activity created a "freedom-inhibiting atmosphere."

Given these circumstances, a reasonable person would not have felt "at liberty to terminate the interrogation and leave."  *Mahan*, 190 F.3d at 421 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).  Although officers may have told Sydnor he was not under arrest, their other actions and words communicated that he was expected to stay put while they executed the

15

search warrant.   Because he was in custody, suppression now turns on whether Sydnor's two statements to Det. Walker were the result of "express questioning or its functional equivalent." *McKinney v. Hoffner*, 830 F.3d 363, 371 (6th Cir. 2016).

## B.  Sydnor's Statement About the Bag of Meth

The first statement that Sydnor challenges was not obtained through express questioning or its functional equivalent.   Sydnor is not arguing that Det. Walker asked him any question about the bag he handed to Harris.   Instead, Sydnor argues that Det. Walker's explanation of the search warrant included "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response."   D.E. 114 at 13 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)).   Sydnor argues:

> Here, the record establishes that Detective Walker arrested Mr. Sydnor and then explained in great detail "how [officers] got to the residence, why [they] were there, explain[ed] about Mr. Harris being arrested, and that [Sydnor] was seen coming from the residence with the bag…."   [R. 103: Transcript, Suppression Hearing, Page 18, Lines 14-18].   Moreover, both detectives agreed that Sydnor made the incriminating statement only after Walker had "implicated him in a crime."   *Id*. at Page 31, Lines 13-22.

*Id*. at 13-14.   Sydnor argues that providing specific details about the investigation that effectively "accused him of participating in [Harris's drug trafficking] crime" constituted a "psychological ploy[]" that was the functional equivalent of direct questioning.   *Id*. at 14-15.   But this is not so.

Sydnor's statement about the bag was the sort of "volunteered statement" not protected by *Miranda*.  *United States v. McConer*, 530 F.3d 484, 495 (6th Cir. 2008).   Interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself."   *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).   Sydnor was not subjected to such compulsion before his

16

statement about the bag.

Courts have frequently admitted incriminating statements that followed an officer's mere description of a defendant's suspected criminal activity. The general rule is that "mere declaratory descriptions of incriminating evidence do not invariably constitute interrogation for *Miranda* purposes." *United States v. Payne*, 954 F.2d 199, 202 (4th Cir. 1992). "Indeed, it may even be in the interest of a defendant to be kept informed about matters relating to the charges against him." *Id.* In *Payne*, for example, an officer told a suspect, "They found a gun at your house." The suspect's reply, "I just had it for my protection," was admissible. *Id.* at 201. The Supreme Court's definition of interrogation, the Court explained, "is not so broad as to capture within *Miranda*'s reach all declaratory statements by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges." *Id.* at 202 (collecting cases); *see also United States v. Hurst*, 228 F.3d 751, 759 (6th Cir. 2000) (finding that the statement, "we've got good information on you," was not an interrogation); *Cort v. Parke*, 875 F.2d 863 (6th Cir. 1989) (finding no interrogation when an officer told a suspect, "Look, you just stabbed a young man up [the] street, up here, and he's probably going to die") (per curiam).

To provide another example, Sydnor's statement is like one that was found to be admissible in *Mullins*. In that case, a narcotics agent told a handcuffed defendant that he knew a package he had just picked up contained oxycodone. *United States v. Mullins*, No. 7:11-CR-4-ART-EBA, 2011 WL 1327030, at *1 (E.D. Ky. Mar. 21, 2011), *report and recommendation adopted*, 2011 WL 1303321 (E.D. Ky. Apr. 6, 2011). Immediately after the agent "identified himself and explained the circumstances," the defendant "blurted out" that he was expecting hydrocodone instead. *Id.* The Court explained that informing a defendant of facts of the

investigation was not an action "reasonably likely to elicit an incriminating response."  *Id*. at *3.[1]

Here, Det. Browning testified that "explaining the search warrant," as Det. Walker did, "is what I normally do" to explain to the resident "why we were there."  DE. 103 at 32.  And Det. Walker testified that "usually when I execute a search warrant, I always tell the occupants . . . what the probable cause is to try to ease their—calm their nerves."  *Id*. at 52.  He had been doing this as a matter of practice for twenty years.  *Id*. at 54.  In this case, explaining the probable cause underlying the search warrant was not the functional equivalent of direct questioning.  Accordingly, Sydnor's statement about the bag was not a response to interrogation and should not be suppressed.

### C.  Sydnor's Statement About the Firearms

According to Det. Walker's testimony, during the search of Sydnor's residence,

> It came to a point where someone upstairs yelled out for a camera.  And at that time, Mr. Sydnor stated that, "Can I put my shoes on before I go to jail?"  Then I followed up.  I stated, "Why would you be going to jail?"  Then that's when he stated that the rifles are his, and he's a convicted felon.

D.E. 103 at 57.  The question now is whether "Why would you be going to jail" was interrogation or its functional equivalent.  Under the Supreme Court's definition in *Innes*, interrogation "refers not only to express questioning, but also to any words or actions on the part

---

[1] Sydnor cites the *Shaneberger* case for the proposition that "the Sixth Circuit has recognized that 'informing the accused that he ha[s] been implicated in a crime by a co-defendant constitutes interrogation under the *Innis* definition.'"  D.E. 114 at 14 (quoting *Shaneberger v. Jones*, 615 F.3d 448, 453 (6th Cir. 2010)).  Sydnor may be suggesting that by explaining the probable cause underlying the search warrant, Det. Walker effectively told Sydnor he had been accused of drug trafficking by the CI.  Assuming this equivalence is correct, what the *Shaneberger* Court said was that "*two Circuits have concluded that* informing the accused that he had been implicated in a crime by a co-defendant constitutes interrogation under the *Innis* definition."  *Id*. (emphasis added).  The Court in *Shaneberger* did not adopt such a rule.  Instead, it declined to find error under AEDPA concerning an ineffective assistance of counsel claim concerning a motion to suppress when an officer had told the suspect that a codefendant had implicated him in a deadly robbery.  *Id*. at 453-54.  At the time this statement was made, the defendant was at the police department being interviewed about an unrelated crime and had invoked his right to counsel.  *Id*. at 451.  The Court found it a "close question" whether the report about the codefendant was the functional equivalent of interrogation.  *Id*. at 454.  *Shaneberger* is too dissimilar to Sydnor's case to guide the analysis of interrogation.

18

of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301.

In this case, the question, "Why would you be going to jail" is both a direct question and a question that police should know would be reasonably likely to elicit an incriminating response. What sort of non-incriminating response could Sydnor have possibly given to this question? Sydnor indicated he believed he was going to jail. The follow-up question by Det. Walker asked to explain why he thought that was the case. Essentially, Det. Walker asked, "tell me what crime you think you committed."

The *Woods* case presents a useful comparison. In that case, an officer was patting down a suspect he had just arrested. The officer felt a lump in the suspect's pocket and asked, "What is in your pocket?" The suspect then confessed to having a gun *in his car*. The object in his pocket was actually his keys. *United States v. Woods*, 711 F.3d 737, 739 (6th Cir. 2013). The Court noted first that the question was a natural and automatic part of a normal arrest. *Id*. at 741. The Court then noted that the answer to the question "could have been either innocuous or incriminating." *Id*. The facts are different here. "Why would you be going to jail" is vastly different from "What is in your pocket." In Sydnor's case, the only reasonably likely and responsive answer would be incriminating.

The government's position is that Det. Walker's question was a clarifying question in response to Sydnor's voluntary, unsolicited statement about putting on his shoes. *See* D.E. 119 at 20. Det. Walker testified that Sydnor was not under arrest and that he did not believe he had probable cause to arrest him. *Id*. at 19 (citing D.E. 103 at 50, 64). According to the government, "If Sydnor believed he was going to jail and Walker didn't, the need for clarification is evident."

19

*Id.* The government relies on *Tolliver*, in which, according to the government's brief,

> the defendant made a spontaneous statement about "getting the other gun out." Id. at 921. The officer responded by asking "is there more than one gun in the apartment?" Id. The Sixth Circuit found that officer's question did not constitute an interrogation because the officer was simply following up on information that had been volunteered[.]

D.E. 119 at 20 (quoting *Tolliver v. Sheets*, 594 F.3d 900, 921 (6th Cir. 2010)).

The Court in *Tolliver* provided the following guidelines:

> The line between impermissible interrogation and permissible follow-up questions to volunteered statements is a fine one. Police may listen to volunteered statements, and need not interrupt a suspect who is volunteering information in order to deliver a *Miranda* warning. *See Miranda*, 384 U.S. at 478, 86 S. Ct. 1602. Police may even interrupt a volunteered statement to ask clarifying or follow-up questions. *See, e.g.*, *U.S. v. Rommy*, 506 F.3d 108, 132-33 (2d Cir. 2007) (collecting cases); *Andersen v. Thieret*, 903 F.2d 526, 532 (7th Cir. 1990) (rejecting custodial interrogation challenge when, in response to suspect's volunteered statement, "I stabbed her," police asked, "Who?"). That said, when asking a suspect about volunteered information, police may at times cross the line from asking clarifying or follow-up questions into the "express questioning or its functional equivalent," *Innis*, 446 U.S. at 300–01, 100 S .Ct. 1682, barred by *Miranda*. *See, e.g., United States v. Crowder*, 62 F.3d 782, 785-86 (6th Cir. 1995) (holding that police officer interrogated suspect when, after suspect stated that shotgun was "in the wood," officer asked clarifying question about location). . . . Again, as the Supreme Court has made clear repeatedly, "[w]ithout obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions . . . that are designed to elicit incriminatory admissions." *Muniz*, 496 U.S. at 602 n. 14, 110 S. Ct. 2638. The difference between permissible follow-up questions and impermissible interrogation clearly turns on whether the police are seeking clarification of something that the suspect has just said, or whether instead the police are seeking to expand the interview. *See, e.g.*, Wayne R. LaFave et al., 2 Criminal Procedure § 6.7(a), at 567 (2d ed. 1999) ("the part of defendant's statement given after the follow-up questions is volunteered only if the questions are neutral efforts to clarify what has already been said rather than apparent attempts to expand the scope of the statement previously made.").

*Tolliver*, 594 F.3d at 920-21.

"When police ask questions of a suspect in custody without administering the required

warnings, *Miranda* dictates that the answers received be *presumed compelled* and that they be

20

excluded from evidence at trial in the government's case in chief." *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1515-16 (6th Cir. 1988) (quoting *Oregon v. Elstad*, 470 U.S. 298, 317 (1985)) (emphasis added). Especially in light the presumption in favor of exclusion, the facts of this case weigh in favor of finding a *Miranda* violation.

Applying *Tolliver*'s guidelines, because a reasonably likely responsive answer to the question could only have been incriminating, the question could not fairly be described as a "*neutral* effort to clarify what has already been said." *See Tolliver*, 594 F.3d at 921. Det. Walker could have responded with a number of neutral statements. But instead, he asked a question that certainly expanded the scope of the conversation. Previously, the conversation related solely to the drug investigation. However, Det. Walker's question could not have been broader in scope. He asked Sydnor to describe any potential crime that Sydnor thought could result in an arrest.

Sydnor's situation is also distinguishable from the facts in *Tolliver*. The defendant in *Tolliver* "volunteered information about 'getting the other gun out.'" *Tolliver*, 594 F.3d at 921. This statement clearly implied that the defendant possessed another gun. The officer's follow-up question, which was essentially "is there more than one gun in the apartment," was deemed not to be an interrogation. *Id*. In *Tolliver*'s case, the defendant made a specific claim (about the number of guns in the apartment), which the officer simply sought to verify. Sydnor's volunteered statement was much vaguer. He did not make a specific claim about committing a specific crime. He indicated broadly a belief that he was going to jail. Det. Walker did not simply reflect the information back to Sydnor. He asked a question that sought greater specificity in a context wherein greater specificity could only reasonably have provided additional incriminating information.

21

Because the test is an objective one to be applied from the suspect's point-of-view, Det. Walker's motivation for asking the question is not particularly relevant.[2]  Instead, looking to the totality of the circumstances, the government has not overcome the presumption that Sydnor's statement—solicited by a direct question—was given in violation of *Miranda*.  The question was not neutral.  It expanded the interview, and the answer could reasonably only have been incriminating.  It was like the question discussed in *Tolliver* (citing *Crowder*, 62 F.3d at 785-86), in which the suspect stated the shotgun was "in the wood," and the officer asked "where."  Like that question, Det. Walker's question was reasonably likely to elicit an incriminating response.  It was an interrogation, and Sydnor's answer should be suppressed.

## IV.  Identification Issues

Finally, Sydnor argues that certain identifications of him should be suppressed.  Several witnesses identified Sydnor based on his driver's license photo, which was displayed by itself, not in a photographic lineup.  The Supreme Court has held that due process requires the suppression of identifications when the procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *Simmons v. United States*, 390 U.S. 377, 384 (1968).  However, to exclude such identifications, a defendant must show both that the identification procedure was unduly suggestive and that the identifications were not otherwise reliable.  *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

Here, the government concedes that using a single photograph is a suggestive identification procedure.  D.E. 119 at 22.  The case then turns on reliability, which is assessed

---

[2] When questioned why he asked the follow-up question, Det. Walker stated, "because I didn't—I mean, at that point, I knew there was no drugs discovered in the residence up to that point.  So when he said that he was going to jail, I was trying to figure out why does he think he's going to jail."  D.E. 103 at 59.

using a number of factors: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil*, 409 U.S. at 199-200.

Sydnor places "three witness identifications at issue."[3]   D.E. 114 at 18.   The first was made by Cathy Jose.   Det. Browning testified that he interviewed Jose on July 8, 2016, which was one month after Sydnor's June 9 arrest on the state gun charge.   D.E. 103 at 23.   According to Det. Browning's testimony, Jose had met Sydnor at least twenty times.   *Id*. at 24.   She had seen him as recently as June 30.   *Id*. at 26.   She said their meetings "always involved narcotics," and she believed Sydnor to be Harris's supplier.   *Id*. at 25.   Among these meetings, Jose had been with Harris in Louisville five times and seen Sydnor there.   *Id*.   Jose was "personally present" and "involved in each of these drug transactions."   *Id*.   When shown Sydnor's picture, Jose gave no hesitation in identifying him.   *Id*. at 26.   With regard to Jose, the factors tip decisively in favor of reliability.   She had numerous opportunities to see Sydnor.   She was a participant in drug transactions, not just a passerby.   She was confident in her identification, and she had seen him recently.

Next, Sydnor challenges the identification by codefendant Paul Dupree.   D.E. 114 at 18. After Dupree was arrested on June 30, 2016, S.A. Tremaine showed him Sydnor's driver's license picture.   Dupree identified the person in the picture as "Black," a man he knew and "had dealings with."   D.E. 103 at 41; *see also* D.E. 65-2 at 4 ¶ 26.   According to S.A. Tremaine's

---

[3] In his original motion to suppress, Sydnor indicated he would challenge the identifications made by the CI and by Paul Dupree.   D.E. 65 at 5.   In his post-hearing memorandum, however, Sydnor raises no argument challenging the CI's photo identification.   The Court considers any argument against the CI's identification waived.   In any event, the CI's identification was reliable for the reasons explained in the government's memorandum, D.E. 119 at 22-23.

testimony, Dupree said "he'd had numerous transactions with Sydnor in Louisville to pick up both heroin and methamphetamine." D.E. 103 at 42. S.A. Tremaine clarified that it had been "around ten" transactions," mostly in May and June of 2016. *Id*. at 42-43. In these transactions, Dupree would give money to Harris, who would tell Dupree where to meet "Black" to pick up the drugs. *Id*. at 43. Dupree identified Sydnor without hesitation. *Id*. at 44. Here again, the factors tip decisively in favor of reliability. Dupree was a recent, repeated customer of Harris and "Black," who had seen Sydnor recently and interacted personally with him around ten times.

Finally, Sydnor challenges the identification by Chelsea Sexton. D.E. 114 at 19. S.A. Tremaine interviewed Sexton somewhat later, on July 27, 2016. D.E. 103 at 44. Sexton told S.A. Tremaine that

> she had met Black a couple of times. She described Black as somebody that reminded her of the musical artist Lil' Wayne. She described Black as being a black male that is short with a dreadlock hairstyle and multiple tattoos. She says that she thinks Black is approximately 30 years old. And at that point, I showed Ms. Sexton a photograph of Sydnor . . . She stated that the hair in the picture was confusing to her, but she looked at it and she says essentially that that's him. . . . She stated that she went up to the hotel room once or twice to meet Black in Louisville. She had seen Black three or four times[.]

*Id*. at 44-45; *see also* D.E. 119-2. Dupree also confirmed that Sexton was with him during some of the drug transactions. D.E. 103 at 45. Although this is a closer call, the facts suggest that Sexton's identification was sufficiently reliable. Although the hair in the picture confused her, Sexton did make a positive identification. Again, she was not just a passerby, but a person who was present with Sydnor during multiple drug transactions. Her identification is further buttressed by the fact that she was able to provide a physical description of "Black" before viewing the driver's license photo. Tellingly, Sydnor has not argued that her physical description of him is inaccurate.

Sydnor also attacks each identification "generally" on the basis that these three witnesses "were of white ancestry, while he is black." D.E. 114 at 19. He provides authorities for the proposition that "cross-racial identifications are less accurate than identifications made by members of the same race." *Id*. Although that may be true as a general matter, Sydnor did not develop any evidence in this case that suggest these particular identifications were unreliable on account of cross-racial effects.

Because the eyewitness identifications were sufficiently reliable, they need not be suppressed despite the fact that they were based on a single photograph.

### V. Conclusion

For the reasons discussed, the undersigned **RECOMMENDS** the following concerning Sydnor's motion to suppress at Docket Entry 65:

(1)     That Sydnor's motion to suppress all his statements on the ground that they were fruit of an illegal arrest be **DENIED.**

(2)     That Sydnor's motion to suppress his statement that he did not know what was in the bag he handed to Harris be **DENIED.**

(3)     That Sydnor's motion to suppress his answer to the question, "Why would you be going to jail," be **GRANTED** as obtained in violation of *Miranda*.

(4)     That Sydnor's motion to suppress three eyewitness photo identifications be **DENIED**.

The Court issues this Recommended Disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The parties should consult that statute and Federal Rule of Criminal Procedure 59(b) concerning the right to appeal to the District Judge. Although there is a pending motion to continue (D.E. 125), **pursuant to Rule 59(b)(2) and because of the rapidly approaching trial date, any**

25

**objection must be filed on or before Monday, December 19, 2016.**   Failure to object in accordance with Rule 59(b) waives a party's right to review.

This the 9th day of December, 2016.

Signed By:

*Hanly A. Ingram*

United States Magistrate Judge