UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MAURICE SYDNOR,<br><br>Defendant. | Criminal No. 16-21-ART-HAI-(2)<br><br>**MEMORANDUM OPINION<br>AND ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

While the police searched his house, Maurice Sydnor made two statements to the officer waiting with him in the living room. But he had not been read his *Miranda* rights. Sydnor moves to suppress those statements at trial. He also moves to suppress the statements of three eyewitnesses who identified a photo of him.

I.

Magistrate Judge Hanly A. Ingram has held a suppression hearing and determined the relevant facts. R. 80; R. 130 at 2–5. As neither party objects to his findings, the Court will adopt them and only give the highlights here.

***The brown bag.*** Back in June 2016, the Kentucky police were investigating a suspected drug dealer, Timothy Harris. One day they sent a confidential informant to meet Harris and his associate, "Black," at Black's home. After Harris got into the informant's car, Black brought a brown bag from his home and handed it to Harris. Harris then told the informant to drive away. They had not gone very far before Harris forced the informant out of the car and took off. But he did not get too far by himself, either; the car had a tracking

device.  Officers caught up with Harris, pulled him over, and found nearly three pounds of crystal methamphetamine in the brown bag that Black had given him.

Those officers sought the help of Detective Larry Walker, a drug-enforcement officer, to secure a search warrant for Black's home.  Black, it turns out, was defendant Maurice Sydnor.  The warrant authorized the officers to search his house for drugs, guns, and ammunition.  At around 2:45 a.m. the next morning, Detective Walker and other officers headed to Sydnor's house.  They knocked and announced themselves, to no answer.  So they forced their way in.  They smelled freshly burnt marijuana.  Sydnor finally emerged and identified himself as the resident.  Detective Walker ordered him onto the floor and cuffed his hands behind his back.  Sydnor sat on the sofa for the duration of the search (one hour and fifteen minutes total).  Detective Walker sat with him.

*The statements.*  While the other officers searched, Detective Walker explained what they were looking for and why.  He said that Sydnor was not under arrest (although he never told Sydnor that he was free to leave).  He also said that officers believed Sydnor had handed Harris a brown bag of crystal meth the day before.  To this, Sydnor responded that he did not know what was in the bag that he had handed Harris.

About thirty minutes later, an officer called from the master bedroom that he needed a camera up there.  Apparently he had found something worth photographing, though he did not say what.  Nevertheless, after hearing that, Sydnor asked Detective Walker if he could put his shoes on before going to jail.  Detective Walker asked, "Why would you be going to jail?"  In response, Sydnor gave a hint as to what the officer might have found in his room: He said that he was a convicted felon, that the rifles were his, and that he kept them for protection. Upstairs, the officer had indeed found two rifles in the bedroom.

2

After Sydnor made these two statements—the bag statement and the rifle statement—Detective Walker asked him whether he wanted to cooperate in the investigation of Harris. Sydnor declined. The officers then arrested him for being a felon in possession of a firearm.

*Photo identifications.*  Over the course of its investigation, the police showed three people a single photo. It was the picture from Sydnor's driver's license. All three of these eyewitnesses correctly identified him, either as Sydnor or Black.

*Motion to suppress.*  The government eventually indicted Sydnor for conspiring to distribute methamphetamine and heroin. Sydnor moves to suppress three things: (1) his bag statement, (2) his rifle statement, and (3) the identifications. R. 65. As to the statements, he argues that he was unlawfully arrested when he made them. R. 114 at 11−16. As to the IDs, he argues that the picture was unduly suggestive and also that cross-racial identification is inherently unreliable (the witnesses were white; Sydnor is black). *Id.* at 17−21.

After the suppression hearing, R. 80, Judge Ingram prepared a thorough Report and Recommendation ("R&R"), R. 130. He reached four conclusions:  First, that though Sydnor was not under formal arrest during the search, he was "in custody"—meaning the Court must suppress any non-Mirandized statements he might have made under interrogation. *Id.* at 2. But second, that Sydnor's bag statement was an "unsolicited voluntary utterance," which the government may use at trial even though Sydnor gave it without a *Miranda* warning. *Id.* Third, that Sydnor's rifle statement was a response to interrogation, which the government may not use at trial absent a *Miranda* warning. *Id.* And finally, that the photo identifications were reliable. *Id.* Thus, Judge Ingram recommends suppressing the rifle statement but not the bag statement or the identifications. *Id.* at 25.

II.

Sydnor and the government both object to the recommendations not in their favor. R. 139; R. 140. The Court reviews those objections *de novo*. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3).

A.

Sydnor objects first to the conclusion that he was not under formal arrest during the search. R. 139 at 2−3. After all, officers placed handcuffs on him when they began their search. And when the handcuffs went on, he argues, he was arrested. *Id*. Because the officers lacked probable cause to arrest him, he says, the arrest was unlawful, and the Court must suppress any statements he made while detained. *Id.*

But not every detention is an arrest. Police are sometimes allowed to detain someone temporarily without formally putting him under arrest. *See United States v. Campbell*, 486 F.3d 949, 953−54 (6th Cir. 2007) (distinguishing an arrest from a temporary detention). One of those times is when they search a house: Officers armed with a valid search warrant may detain the home's occupants during the search. *See Michigan v. Summers*, 452 U.S. 692, 704−05 (1981). Such detention intrudes only "incremental[ly]" on personal liberty; after all, the police already have permission to search the place. *Id.* at 703. At the same time, this temporary detention serves "substantial" law-enforcement needs: it ensures officers' safety, prevents the occupants from fleeing if incriminating evidence turns up, and enables them to assist with the search if they so choose. *Muehler v. Mena*, 544 U.S. 93, 98 (2005); *Summers*, 452 U.S. at 701−05. For these reasons, when the police have a warrant to search a house, they have "categorical" authority to detain the people inside it for the duration of the search. *Muehler*, 544 U.S. at 98.

The police used that authority here. Detective Walker and the others showed up at Sydnor's door with a warrant to search for drugs and guns. As in *Summers*, they needed to make sure that Sydnor would not fight or flee. As in *Summers*, it did not matter whether Sydnor posed a "special danger" to them; they were searching for drugs and guns, "the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." 452 U.S. at 702−03. Facing that risk, the officers detained Sydnor so that they could "exercise unquestioned command of the situation." *Id.*; *see also Muehler*, 544 U.S. at 98−100 (concluding that officers acted reasonably in keeping the defendant in handcuffs for two to three hours while they searched her home for weapons).

Thus, rather than formally arresting Sydnor, the officers temporarily detained him. Because their authority to do so was categorical, the detention was lawful. *Summers*, 452 U.S. at 701–05; *Muehler*, 544 U.S. at 98–100.

Sydnor tries to avoid *Summers* by arguing that, search warrant notwithstanding, the officers lacked sufficient justification to hold him. R. 139 at 7−11. For that proposition he cites *United States v. Binford*, 818 F.3d 261 (6th Cir. 2016). R. 139 at 8. There the police had detained and questioned the defendant in his bathroom while they searched his house. *Id*. at 266. The Sixth Circuit held that *Summers* permitted the detention, going on to say that "a police officer's authority to detain an occupant *during a Summers detention* may be based on pre-existing reasonable suspicion" that he had committed a crime. *Id*. at 270. According to Sydnor, the court only permitted the detention because the police had an independent basis for that suspicion—beyond the search warrant itself: Binford had twice sold drugs to a confidential informant. R. 139 at 9. And so, the argument goes, the police did not have sufficient justification to detain *Sydnor* because they had no such information on him. *Id*.

5

That argument runs contrary to both *Summers* and *Binford*. Both describe the search warrant itself as an independent—and sufficient—justification for detaining someone while searching his home. *Summers*, 452 U.S. at 703 ("The existence of a search warrant . . . provides an objective justification for the detention."); *Binford*, 818 F.3d at 270 ("[The officer] was not required to have *additional* reasonable suspicion to question [the defendant] in the bathroom." (emphasis added)). Nothing more is required. Indeed, the *Binford* court heard—and rejected—the same independent-suspicion argument that Sydnor makes here. *See* 818 F.3d at 270 ("[O]fficers are not required to have 'independent reasonable suspicion' before questioning an occupant." (quoting *Muehler*, 544 U.S. at 100−01)). Seeing as "[a]n officer's authority to detain incident to a search is categorical," that authority exists as long as he has the authority (*i.e.*, probable cause) to conduct the search. *Muehler*, 544 U.S. at 98; *see Binford*, 818 F.3d at 270. Thus, under *Summers* and *Binford*, the warrant here justified Sydnor's temporary detention.

B.

Although Sydnor was not under formal arrest while the police searched his house, Judge Ingram still found that he was "in custody" for *Miranda* purposes. R. 130 at 10–16. Neither party objects to that finding, but both disagree with his recommendation about which custodial statements the Court should suppress—the government with his recommendation to suppress the gun statement, R. 140 at 5−16, Sydnor with his recommendation not to suppress the bag statement, R. 139 at 5–7.

The government may not force anyone to serve as "a witness against himself." U.S. Const. amend. V. *Miranda* protects that right by requiring officers to give a host of warnings before interrogating a suspect. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). If the officer

6

fails to give these *Miranda* warnings, the government may not use the suspect's statements against him at trial. *Oregon v. Elstad*, 470 U.S. 298, 317 (1985); *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1515−16 (6th Cir. 1988). Everyone agrees that Detective Walker did not read out any *Miranda* warning before Sydnor gave his bag or his gun statements. R. 103 at 67. So the only question is whether Sydnor gave them under interrogation.

Interrogation has two forms: (1) express questioning or (2) its functional equivalent. Express questioning is what one first thinks of as interrogation: a direct question "designed to ferret out the suspect's involvement in the case." *Bachynski v. Stewart*, 813 F.3d 241, 246 (6th Cir. 2015). The functional equivalent of a direct question includes any words or actions "that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). If a reasonable person, given all of the facts and circumstances, "would view the police as attempting to obtain a response to use at trial," then the officer's question is an interrogation. *Bachynski*, 813 F.3d at 246.

But just as not every detention is an arrest, not every statement a suspect makes to the police is a response to interrogation. Sometimes suspects give the police information that the police never asked for. And the police "cannot be held accountable for the unforeseeable results of their words or actions." *Innis*, 226 U.S. at 302. Thus, if an officer has used only the words and actions "normally attendant to arrest and custody"—*i.e.*, that he normally must use to put someone under arrest—he has not conducted an interrogation, regardless of what the suspect might volunteer. *Id.* at 301. Hearing "freeze!" might provoke someone to reply, "alright, you caught me." Yet the Court would not need to suppress those incriminating words. The Fifth Amendment does not bar volunteered but non-Mirandized statements. *United States v. McConer*, 530 F.3d 484, 495 (6th Cir. 2008).

7

1.

First, when Detective Walker told Sydnor why police were searching his house—namely, because they knew about the bag he handed to Harris—Sydnor stated that he did not know what was inside the bag. R. 103 at 56. Though Detective Walker had not read any *Miranda* warning yet, Judge Ingram concluded that Sydnor's statement was voluntary and thus need not be suppressed. R. 130 at 16–18. Sydnor objects, contending that Detective Walker used a psychological ploy to get him talking: provide details about the investigation, reveal what the informant said about the bag, and then implicate Sydnor in a criminal act. R. 139 at 5−7. Only then, Sydnor says, was he induced to talk about the bag. *Id.* at 13−14.[1]

It is true that "compelling influences" or "psychological ploys" can be the functional equivalent of direct questioning. *Arizona v. Mauro*, 481 U.S. 520, 529 (1987); *see also Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) ("An involuntary confession may result from psychological, no less than physical, coercion by law enforcement officials."). But *Miranda* warnings are required beforehand only if the compulsion is out of the ordinary, *i.e.*, if the officers did more than just put the defendant in custody. *See Innis*, 446 U.S. at 300 ("'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself."); *see also Illinois v. Perkins*, 496 U.S. 292, 297 (1990) ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns.").

---

[1] Sydnor also seems to make much of the fact that Detective Walker asked Sydnor to cooperate with the investigation against Harris. *See* R. 139 at 9. The record shows, however, that Detective Walker did not ask for cooperation until *after* Sydnor made the comment about the brown bag, R. 103 at 19, so Detective Walker's later efforts do not help resolve the admissibility of Sydnor's statement.

Here, Detective Walker used no psychological ploys—let alone any extraordinarily coercive ones. His own statements to Sydnor were the kind "normally attendant to arrest and custody." *Innis*, 446 U.S. at 300. As he testified at the suppression hearing, he merely explained the search warrant and the probable cause underlying it, as officers normally do when they show up to search someone's home. R. 103 at 52 ("I was just trying to—I mean, trying to explain to him why we was in his residence at 3:00 in the morning. . . . So usually when I execute a search warrant, I always tell the occupants, or the homeowner . . . what the probable cause is to try to ease their—calm their nerves."). That type of background detail—offered in declaratory sentences, intended merely to explaining the nature of the investigation and the reason for the officers' presence—is not the compulsion that *Miranda* aims to curtail. *E.g.*, *United States v. Hurst*, 228 F.3d 751, 759−60 (6th Cir. 2000) ("[T]he mere statement by [the officer] that 'we've got good information on you,' viewed in context, contains no compulsive element suggesting a Fifth Amendment violation[.]"); *see also United States v. Murphy*, 107 F.3d 1199, 1205 (6th Cir. 1997) (holding that an officer's advice that "things would be easier for [the defendant] if he talked" was not interrogation); *Cort v. Parke*, 875 F.2d 863, at **1−2 (6th Cir. 1989) (table) (per curiam) (holding that an officer's statement that "Look, you just stabbed a young man up [the] street" was not interrogation); *see also United States v. Payne*, 954 F.2d 199, 201−03 (4th Cir. 1992) (holding that a statement similar to Sydnor's was admissible because "mere declaratory descriptions of incriminating evidence do not invariably constitute interrogation"; the officer had said, "They found a gun at your house," to which the defendant had responded, "I just had it for my protection.").

Detective Walker's statements were part and parcel of executing a search warrant. If a *Miranda* warning must precede such statements, then the police will need to give a warning

before even declaring their purpose for arriving on the scene. The Sixth Circuit has not been "prepared to forbid police from conveying to suspects the seriousness of the crime for which they are being investigated." *McCalvin v. Yukins*, 444 F.3d 713, 721 (6th Cir. 2006). Nor has the Supreme Court. *Cf. Arizona v. Roberson*, 486 U.S. 675, 687 (1988) (differentiating interrogation from merely "inform[ing] the suspect of the facts of" an investigation).

In short, Detective Walker was explaining why officers were entering Sydnor's house in the middle of the night, not trying to elicit an incriminating statement. The Court need not suppress the incriminating statement that Sydnor volunteered in response. *See Miranda*, 384 U.S. at 478; *McConer*, 530 F.3d at 495.

2.

Second, after an officer called down for a camera, Sydnor asked if he could put on his shoes before going to jail. Detective Walker then asked, "Why would you be going to jail?" To which Sydnor replied that he was a convicted felon who owned rifles. R. 103 at 56−57. Judge Ingram concluded that Sydnor gave this gun statement in response to an interrogation. R. 130 at 18–22. The government objects, arguing that Detective Walker's question—"Why would you be going to jail"?—was a mere clarifying question, not an interrogation. R. 140 at 6–16. According to the government, Detective Walker did not know why Sydnor thought he would be going to jail; Detective Walker had already told him he would not be, and did not himself know about the guns upstairs. So, the government contends, Detective Walker simply sought to clear up that "misunderstanding." *Id.* at 16.

As discussed, the Fifth Amendment does not bar voluntary statements. *McConer*, 530 F.3d at 495. So if Judge Ingram had recommended suppressing Sydnor's voluntary question about putting on shoes, the government's objection would be well taken. But Judge Ingram

10

recommends suppressing Sydnor's *response* to a question from Detective Walker, a response in which Sydnor identified himself as a rifle-owning convicted felon. R. 140 at 25. And that statement sits on a "fine" line. *Tolliver v. Sheets*, 594 F.3d 900, 920 (6th Cir. 2010). On one side: When someone is volunteering statements to the police, the police get some leeway. They can of course listen to the statement without interrupting to give a *Miranda* warning. But they also can interrupt to ask clarifying or follow-up questions—again, without reading a *Miranda* warning. *Id.* On the other side: The police cannot "seek[] to expand the interview" under the guise of a follow-up question, at least not without a *Miranda* warning. *Id.* at 921. That question will turn the conversation into an interrogation.

At first glance, the government's claim—that Detective Walker asked a permissible follow-up question—seems plausible. Before that question, the scene was not your typical interrogation. Detective Walker was not a key figure in the investigation; as such, he did not know the whole "back story on the case." R. 103 at 55. He did know that his fellow officers had not yet found incriminating evidence and thus lacked probable cause to arrest Sydnor. *Id.* at 59. But his own role was only to help them get a search warrant and, once the search began, to sit with Sydnor. And they sat in relative silence. After the bag statement, and until an officer called down for a camera, Detective Walker never asked Sydnor any questions. *Id.* at 57. Considering just these facts, one might agree that Detective Walker really did need—and really was seeking—clarification after Sydnor's sudden and unexpected mention of jail. *See, e.g.*, *United States v. Cash*, 733 F.3d 1264, 1278–79 (10th Cir. 2013) (holding that the follow-up question in this exchange between a defendant and a probation officer did not turn the exchange into an interrogation: Q: "[W]hat[']s] going on?" A: "You've got to help me. They're going to kill me." Q: "What's the deal?" A: "I've been dealing drugs[.]").

11

But the scene changed after the officer in the bedroom called down for a camera. Presumably he was not interested in Sydnor's choice of décor. So after hearing that call, one's common sense would suggest the officer had found something incriminating—even if one does not know exactly what. Otherwise, why take a picture?

Moreover, it was right after hearing this call that Sydnor mentioned going to jail. At this point, there was little ambiguity left for Detective Walker to clarify. Although he might yet have been comparatively more in the dark than his fellow officers, he knew they were searching for drugs, guns, and ammunition. He knew that an officer wanted to photograph something, a common impulse for police to have when they find what they are looking for. And he knew that Sydnor thought he was headed to jail, a common thought for someone to have when the police find what they are looking for. In its full context, Detective Walker's question was not a "neutral effort[] to clarify" what Sydnor had asked. *Tolliver*, 594 F.3d at 921 (quoting 2 Wayne R. LaFave et al., Criminal Procedure § 6.7(a), at 567 (2d ed. 1999)). It was less of a "what's going on?" and more of a "what did you do?" Although Sydnor had initiated the conversation, Detective Walker turned it into an interrogation—by asking what Sydnor thought he had done to warrant his arrest and incarceration.

Admittedly, because the line between clarifying questions and direct question is such a "fine one," it can be difficult to tell on which side a particular question will fall. *Tolliver*, 594 F.3d at 920. So the "police may at times cross it" with a question that—in one context— is merely a clarifying question, but that in another context turns into direct questioning. *Id.* And if the defendant moves to suppress his response to that question, the court must return to the dispositive issue: Should the officer have known that his question was reasonably likely to elicit an incriminating response? *Innis*, 446 U.S. at 301−02. And here, the answer is yes.

12

The government is right that Sydnor *could* have given Detective Walker a more innocuous answer. R. 140 at 10. But that is the just same as saying he could have evaded the question. The most responsive way to answer a question like "Why would you be going to jail?" is to explain what one thinks he did to land behind bars, *i.e.*, to give an "incriminating response." *Innis*, 446 U.S. at 301. Because that is the obvious answer to the question, such a question is "reasonably likely to elicit" that answer. *Id.* Thus, Sydnor gave a non-Mirandized statement about his rifles in response to an interrogation. That statement must be suppressed.

## C.

Finally, Sydnor argues that the eyewitness photo identifications are too unreliable to use at trial. R. 139 at 14.

Due process requires the Court to exclude out-of-court eyewitness identifications if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood" of misidentification. *Simmons v. United States*, 390 U.S. 377, 384 (1968); *see Neil v. Biggers*, 409 U.S. 188, 198 (1972). To get such evidence excluded, a defendant must show, first, that the identification procedure was "unnecessarily suggestive." *Neil*, 409 U.S. at 198–99. But an identification might still be "reliable" even though the "procedure was suggestive." *Id.* at 199. The defendant therefore must show, second, that the identification was not otherwise reliable under "the totality of the circumstances." *Id.*

The government concedes that using a single photo for eyewitness identification—which it did here with Sydnor's license picture—is suggestive. R. 119 at 22; *see Pankey v. United States*, 908 F.2d 973, at *2 (6th Cir. 1990) (table) (per curiam). So the only question left is reliability. The Court must balance several factors: whether the witnesses saw Sydnor at the time of the crime, their degree of attention, whether their prior descriptions of Sydnor

13

were accurate, their level of certainty, and the length of time from crime to identification. *Neil*, 409 U.S. at 199−200. Based on these factors, Judge Ingram concluded that all three identifications are sufficiently reliable. R. 130 at 22–25.

1.

Sydnor objects in two ways. First, he argues that Judge Ingram's scales were simply off balance. R. 139 at 14–17. In support, he recites many favorable facts that came out at the suppression hearing. Judge Ingram has already considered these facts—along with those less favorable to Sydnor. R. 130 at 22–25. Briefly, this is what they show:

**Cathy Jose** spoke to the police about a month after Sydnor's arrest and immediately after her own. She gave no description of Sydnor before identifying his picture. R. 103 at 23–24. On the other hand, she had met Sydnor at least twenty times, drugs were always involved, and she did not hesitate before identifying him. *Id.* at 24−26. So although about a month separated the crime and the identification, and although Jose did not give a prior description of him, she nevertheless saw Sydnor engage in crime and was apparently paying attention because she identified him with certainty.

Like Jose, **Paul Depree** identified Sydnor only after his own arrest. *Id.* at 40–41; R. 139 at 15. This identification occurred some days or weeks since Depree's last interaction with Sydnor, and Depree apparently did not give any description of Sydnor before seeing his photograph. R. 103 at 43. At the same time, however, Depree said he knew "Black" and had engaged in numerous drug transactions with him, and he identified the photograph without hesitation. *Id.* at 41−44. So again, the timing and prior-description factors might weigh slightly against reliability, but the others weigh in favor.

Finally, **Chelsea Sexton** also identified Sydnor about a month after his arrest while she was in custody herself. *Id.* at 42. She did not describe her last interaction with Sydnor. Moreover, she qualified her identification, stating that the hair in the picture confused her but that the man was "essentially" Sydnor. *Id.* at 45. Yet she had met Sydnor in a few prior drug transactions, and she aptly described him before seeing the license photo. *Id.* at 44−45. So if the timing and certainty factors weigh against reliability, the other factors—especially her observations and accurate prior description of him—weigh in favor.

On balance, the reliable factors outweigh the unreliable ones that Sydnor highlights. All three witnesses were familiar with Sydnor, having met him during several previous drug transactions. Jose and Depree each quickly identified Sydnor as the man in the photo, and Sexton accurately described him before seeing it. These are strong indicia of reliability, and they outweigh any concerns about timing; clearly, the handful of weeks between when these witnesses last interacted with Sydnor and when they identified him did not diminish their memories of him. Thus, all three identifications are reliable enough to present to the jury.

2.

Second, Sydnor argues that cross-racial identifications are inherently unreliable and that Judge Ingram did not sufficiently address his previous argument to this effect. R. 139 at 16–17. Sydnor notes that he is African-American but that the eyewitnesses are either white or Hispanic. *Id.* at 17. And he cites a few journal articles about the probability of a witness misidentifying a suspect of a different race. *Id.* at 16−17.

But as Judge Ingram noted, Sydnor has not "develop[ed] any evidence *in this case*" suggesting that *these three witnesses* made unreliable identifications because of "cross-racial effects." R. 130 at 25. And the Court cannot suppress identifications based simply on

15

generalizations about race. Of course, Sydnor can still challenge these witnesses' reliability before the jury—the ultimate arbiter of credibility—with the help of experts (if reliable) and special jury instructions (if appropriate). *Cf. United States v. Washam*, 468 F. App'x 568, 572 (6th Cir. 2012) (discussing jury instructions related to cross-racial identifications); *United States v. Smithers*, 212 F.3d 306, 313 (6th Cir. 2000) (considering expert testimony about cross-racial identifications). But without any evidence before it now, the Court cannot suppress these identifications just because they happen to be cross-racial.

### III.

In sum, the police did not immediately place Sydnor under formal arrest when they searched his home. Instead, they temporarily detained him for the duration of the search. He was still in their custody, however, and while in their custody Sydnor made two statements before receiving any *Miranda* warnings. His statement about the contents of the brown bag was voluntary, so the Court need not suppress it. But his statement about his rifles stemmed from interrogation; the Court therefore must suppress that one. Finally, the three eyewitness identifications are sufficiently reliable to send to the jury, who will ultimately decide whether those identifications are credible.

Accordingly, it is **ORDERED** as follows:

(1)    Sydnor's objections to the R&R, R. 139, are **OVERRULED**.

(2)    The government's objections to the R&R, R. 140, are **OVERRULED**.

(3)    Judge Ingram's R&R, R. 130, is **ADOPTED** as the opinion of the Court.

(4)    Sydnor's motion to suppress, R. 65, is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to Sydnor's response to Detective Walker's question about why he thought he was going to jail. The motion is

**DENIED** as to Sydnor's voluntary statement about the brown bag and as to the three eyewitness photo identifications.

This the 28th day of February, 2017.

Signed By:
*Amul R. Thapar* AT
United States District Judge